UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GARY MONTGOMERY, | |
| Plaintiff, | Case No. 3:23-cv-00275 |
| v. | Judge Aleta A. Trauger |
| | Magistrate Judge Alistair E. Newbern |
| PHILIP E. SMITH et al., | |
| Defendants. | |

To:     The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

Pro se and incarcerated Plaintiff Gary Montgomery filed this action to address an alleged "scheme to defraud [him] of assets and steal his solo 401k retirement money" executed through the division of property in Montgomery's divorce from Lesley Burnett Montgomery (LBM). (Doc. No. 11 ¶ 27.) Montgomery brings claims against LBM; her romantic partner Jonathan Taylor; the late Tennessee Circuit Court Judge Philip E. Smith's estate; LBM's divorce attorney William H. Stover; real estate agent Vicki Hertel and Regal Realty Group; real estate agent Brandon Schneider and Exit Real Estate Solutions; prospective property buyer Doug Rogers; title companies Birthright Title and Property Title Services; and Montgomery's former criminal defense attorney Thomas A. Longaberger. (Doc. No. 1.)

Four motions to dismiss are pending, filed by (1) Birthright Title, Exit Real Estate Solutions, Property Title Services, Rogers, and Schneider (collectively, the Real Estate Defendants) (Doc. No. 27); (2) Vicki Hertel and Regal Realty Group (Regal) (Doc. No. 35); (3) the estate of Philip E. Smith (Smith) (Doc. No. 43); and (4) Stover (Doc. No. 47). Montgomery

has responded in opposition to each motion (Doc. Nos. 31, 46, 56, 58), and Regal and Hertel filed replies (Doc. Nos. 50, 51).

LBM, Taylor, and Longaberger have not appeared in the action.[1]

The Court referred this action to the Magistrate Judge for case management and to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 4.) For the reasons that follow, the Magistrate Judge will recommend that the Court grant the Real Estate Defendants', Regal and Hertel, and Smith's motions in full and grant Stover's motion in part as to Montgomery's state law legal malpractice claim and decline to exercise supplemental jurisdiction over Montgomery's state law conversion claim.

## I.      Background

### A.      Factual Background

The following allegations taken from Montgomery's amended complaint (Doc. No. 11) are assumed to be true at this stage of the litigation. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 195 (2024).

Courts may consider "public records or [matters that] are otherwise appropriate for the taking of judicial notice" without converting a motion to dismiss into a motion for summary judgment. *New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003). "Such public records that a court may consider include documents from other court proceedings." *Watermark Senior Living Ret. Communities, Inc. v. Morrison Mgmt. Specialists, Inc.*, 905 F.3d 421, 425–26 (6th Cir. 2018). The Court takes judicial notice of and includes in this factual background and its legal analysis filings in the Montgomerys' divorce

---

[1]      The Magistrate Judge will address the status of Montgomery's claims against LBM and Taylor by separate order. Montgomery has filed a second motion for entry of default against Longaberger that will be addressed by the Clerk of Court. (Doc. No. 72.)

proceedings and Montgomery's criminal cases that provide necessary context for Montgomery's claims.

The Court includes only the allegations that are relevant to the pending motions to dismiss.

Montgomery and LBM married in 2002 and lived in California. (Doc. No. 11 ¶ 18.) Montgomery worked for Santa Clara County and also "had a real estate investment and flipping company, 'Bzbzbzboy Inc.' [that] he operated alone since 1986." (*Id.* ¶¶ 16–17.) After marital difficulties, Mongtomery and LBM separated in 2006, and Montgomery moved to Nashville, Tennessee. (*Id.* ¶¶ 19–21.) Montgomery states that he borrowed $50,000 from his Santa Clara County 401(k) retirement account to purchase a house at on Lakeview Circle in Mount Juliet, Tennessee (the Lakeview Property). (*Id.* ¶ 22.) He and LBM reconciled in 2007 and LBM joined him in Nashville. (*Id.* ¶ 23.)

In 2010, Montgomery created a "solo" 401(k) plan for his company, designated as the "Bzbzbzboy, Inc. 401K Plan" (the 401K Plan). (*Id.* ¶ 24.) The 401K Plan then purchased the Lakeview Property "as its first investment holding" and was the property's only owner. (*Id.* ¶¶ 24, 53.) In 2015, Montgomery purchased a property on Donna Hill Drive in Nashville (the Donna Hill Property) where Taylor was a tenant with the intent to have the 401K Plan acquire the property in 2016. (*Id.* ¶ 29.)

Montgomery alleges that, in 2016, "LBM and her lover/boyfriend [Taylor] hatched a scheme to defraud [Montgomery] of assets and steal his solo 401k retirement money" by "create[ing] a fictitious story alleging [Montgomery] planned to have LBM killed . . . ." (*Id.* ¶ 27.) Since 2016, Montgomery has been charged with multiple counts of solicitation of first-degree murder under Tennessee law. This Court summarized those charges as follows:

> In May 2016, Montgomery was charged with solicitation of first-degree murder for allegedly trying to hire [Taylor] to murder his wife [LBM]. Over the next several

years, Montgomery was indicted two more times, first for attempting to hire a cellmate to murder his wife and Taylor, and second for attempting to hire a cellmate to murder his wife, Taylor, the first cellmate, and Montgomery's first appointed counsel.

*Montgomery v. Hall*, No. 3:21-CV-00701, 2022 WL 2721056, at *1 (M.D. Tenn. June 6, 2022).[2]

Montgomery was convicted of one count of solicitation of felony murder on July 19, 2023. His other charges remain pending.[3]

LBM filed for divorce in May or June 2016 represented by Stover. (Doc. No. 11 ¶ 31.) Montgomery represented himself in the divorce proceedings over which Smith presided. Montgomery alleges that Stover "had a conflict of interest" representing LBM in the divorce because Montgomery and LBM had hired Stover to evict Taylor from the Donna Hill Property. (*Id.* ¶ 35.) Montgomery states that he advised Smith of this conflict but Smith "did nothing as if [Montgomery] never spoke." (*Id.*)

Montgomery was in custody as a pretrial detainee during the divorce proceedings and states that Smith allowed Montgomery's custodial status to negatively affect his "judgment and professionalism." (*Id.* ¶ 40.) Montgomery states that Smith spoke to him condescendingly (*id.*), kept Montgomery from questioning witnesses to the same extent that he allowed Stover to question witnesses (*id.* ¶ 50), and "abused his discretion in forcing the civil trial to go forward while simultaneously a criminal case was active with similar allegations, which severely limited what [Montgomery] could say and do" (*id.* ¶ 51). Montgomery further alleges that Smith made errors

---

[2]     Montgomery alleges in this case that Taylor and LBM admitted that Montgomery "never hired or even directed [Taylor] to do anything to anyone" and asserts that his criminal charges are based on "lies and fraud." (Doc. No. 11 ¶¶ 30–33.)

[3]     *See* Metropolitan Nashville & Davidson County Criminal Court Case Search, https://sci.ccc.nashville.gov/Search/NameSearchDetails/GARY%5EMONTGOMERY%5E0210 1961%5E548597/ (last visited August 4, 2024).

of law and fact in determining what of the Montgomerys' assets were marital property, including in his consideration of the 401K Plan (*id*. ¶¶ 52, 55, 56, 58).

Montgomery alleges that LBM "demand[ed]" that the court "give her control of [the Lakeview Property]" "by conspiring with [Stover], saying to the court it was her property" even though the property "was titled to [Montgomery] alone." (*Id.* ¶ 31.) He states that LBM and Stover "conspired to trick the court with misrepresentations to cover up the true owner and the existence of a standing trustee" and that "Smith ignored [Montgomery's] notices of all that info[rmation]."[4] (*Id.* ¶ 38.) He also alleges that Stover and LBM "stole [his] corporate binder[s]" that contained information regarding Bzbzbzboy Inc. and the 401K Plan. (*Id.* ¶ 39.)

After hearings in which Montgomery participated, Smith entered a final divorce decree on January 29, 2020. (Doc. No. 38-1.)[5] Smith found that the proof established "that [LBM's] 401k money acquired during the marriage was used to purchase [the Lakeview Property]", that LBM's "401k money was deposited into the Bzbzbzboy 401K plan of which [Montgomery] was the trustee", that the Lakeview Property was originally purchased by Montgomery alone, was later conveyed to the 401K Plan, and was marital property.[6] (*Id.* at PageID# 353.) Smith found that the Donna Hill property was "titled in both of the party's [sic] names" and was marital property. (*Id.* at PageID# 354.) Smith also found that a $40,000 IRS levy on LBM's paycheck for unpaid taxes

---

[4]     Montgomery states that, "[i]n May 2016 [he] enrolled the services of his neighbor, Ramiro Alvarez, to be the alternate trustee whom [he] trusted more with financial issues than LBM." (*Id.* ¶ 36.)

[5]     Regal Realty Group and Hertel attached the Final Decree of Divorce and two subsequent orders from Smith addressing the distribution of property as exhibits to their motion to dismiss. (Doc. Nos. 38-1–38-4.) The Court considers these orders as public records and cites the copies of the orders filed in this action for ease of reference.

[6]     Smith specifically noted that "[t]he real property is owned by Bzbzbzboy, which was originally set up as a 401k." (*Id.* at PageID# 357.)

5

was "in fact, a marital debt" because it was "the result of unpaid taxes on a security account that [ ] Montgomery controlled" and that LBM and Montgomery were both parties to an installment contract to pay off an HVAC system at the Lakeview Property. (*Id.* at PageID# 354–55.)

Ultimately, Smith entered the following judgment regarding the division of the marital property:

> It is further **ORDERED, ADJUDGED AND DECREED** that: [LBM] is hereby ordered to sell the real property at 382 Lakeview Circle. LBM is further vested the sole authority to select the real estate listing agent. . . .

> \*      \*      \*

> It is further **ORDERED, ADJUDGED AND DECREED** that: The Plaintiff/Wife [LBM] is hereby ordered to forward any serious offers to [Stover], who will then forward those offers to [Montgomery].

> It is further **ORDERED, ADJUDGED AND DECREED** that: [LBM] is hereby ordered to direct the closing agent after the sale of the property in Mt. Juliet, pay directly therefrom the IRS debt of approximately $40,000 or balance at that time to be paid from the proceeds of the sale.

> It is further **ORDERED, ADJUDGED AND DECREED** that: [LBM] is hereby ordered to direct the closing agent after the sale of the [Lakeview Property], pay directly therefrom the balance of the HVAC loan from the proceeds of the sale.

> It is further **ORDERED, ADJUDGED AND DECREED** that: The balance of the sale proceeds of the [Lakeview Property] will be divided equally after deduction of the payment of the IRS debt, and the HVAC loan. [LBM] will receive her proceeds at the closing. [ ] Montgomery's proceeds from the sale will be held and deposited into an interest-bearing escrow account with the clerk at the circuit court until such time as this Final Decree becomes final.

> It is further **ORDERED, ADJUDGED AND DECREED** that: [LBM] is hereby awarded the real property located at 27I8 Donna Hill Drive free and clear of any claim from [ ] Montgomery. [ ] Montgomery is hereby divested of all right, title and interest in said property and [LBM] is solely responsible for all payments associated with said property, including the mortgage, taxes, and insurance. . . .

(*Id.* at PageID# 362–63.)

Montgomery alleges that Smith "abused the process and his discretion by declaring all assets marital property . . . when the contributions [by Montgomery and LBM to the 401K Plan]

6

were clearly kept separate." (*Id.* ¶ 55.) Montgomery alleges that Smith allowed the 401K Plan "to be destroyed by selling it and using the funds to pay a loan and LBM's personal IRS tax debt of $40,000+, all violations of ERISA's protections." (Doc. No. 11 ¶ 56.) He states that Smith "unreasonably debased [Montgomery's] retirement account and its ability to earn/grow in the future" by requiring that proceeds from the sale of the Lakeview Property be deposited into "a court controlled bank account paying 0.25% interest" when Montgomery had previously earned "$39.000/year towards retirement plan growth . . . ." (*Id.* ¶ 58.) Montgomery alleges that Smith further abused his discretion by denying Montgomery a transcript of the divorce proceedings and "cherry pick[ing]" evidence to be included in the record on appeal "to avoid any legitimate review." (*Id.* ¶ 60.)

Montgomery alleges that, "once [LBM] got court approval to collect and manage the Plan's assets, she also assumed a fiduciary role to the Plan participants." (*Id.* ¶ 42.) Montgomery states that, instead of acting as a fiduciary, LBM "chose to pocket/commingle the rental income from all Plan properties with her personal funds from [June 2016 to at least June 2022]." (*Id.*) He states that he has not received "one penny" of the Plan's proceeds from this rental income and that the 401K Plan has "suffered negatively" from LBM's management. (*Id.*) Montgomery alleges that LBM has not "provided a single ERISA report on funds collected, where they were deposited or any distributions" and has used the funds "to pay her counsel expenses and for her personal needs." (*Id.* ¶ 45.) He alleges that Stover "knowingly accepted funds for inflated fees that he knew came from the Plan's rental income in violation of ERISA" and "conspired with LBM to do whatever he could to insure [sic] LBM got access to the funds" and Montgomery's efforts to access the funds were denied. (*Id.* ¶ 46.)

7

Montgomery states that, on or about September 30, 2021, he "received a signed offer and counteroffer of the [Lakeview Property]" with LBM listed as the seller and Rogers listed as the buyer. (Doc. No. 11 ¶ 61.) Montgomery states that he "immediately objected in writing to the court, Stover, all real estate licen[s]ees, real estate firms and title companies involved" because he "never approved or signed a listing agreement" and "didn't receive any prior notice or an offer to consider until everything [was] signed." (*Id.* ¶ 62.) Montgomery also filed a "lis pendens notice" on the property "and sent that to the court and all defendants to avoid any mistake by closing the sale." (*Id.* ¶ 65.) Montgomery states that LBM "was not the plan administrator at the time of this offer, only an acting fiduciary/trustee from the court," that "the property was not legally listed," and that the property "was manipulated into sale by LBM and Stover's tricks/sleight of hand." (*Id.* ¶ 63.) Montgomery states that he "objected in open court," but that Smith "ignored those objections as if not said" and "ignored contrary evidence and ERISA protections." (*Id.*) Montgomery alleges that Rogers "failed to heed [Montgomery's] notices and warning letters there was a lis pendens on the 401K Plan property he was attempting to purchase and that the true owner was the Plan and not [LBM]." (*Id.* ¶ 85.) Montgomery states that Rogers "intentionally chose to continue to conspire with LBM, Stover, title companies and the real estate professionals for self-dealing motives." (*Id.*)

LBM and Montgomery appeared before Smith for a hearing on December 10, 2021, regarding the contract to sell the Lakeview Property to Rogers. (Doc. No. 38-2.) Smith found the sale consistent with the divorce decree's finding that the Lakeview Property "titled in the name of BZBZBZBoy Inc. 401k Plan is marital property" and ordered that LBM "sell the house, divide the net proceeds 50/50, and to pay [Montgomery's] share into the Circuit Court Clerk's office in an interest bearing account." (*Id.* at PageID# 368.) On December 13, 2021, Smith entered an "Order Approving Contract" that stated:

> [I]t is ORDERED, ADJUDGED, AND DECREED: That the contract to sale the real property located at 382 Lakeview Circle, Mount Juliet, Tennessee 37122 to [Rogers] for $503,500.00 is hereby approved and ratified by the court.
>
> It is further ORDERED, ADJUDGED, AND DECREED: that [LBM] is hereby granted the authority to sign all closing documents necessary to transfer title of said property from BZBZBZboy Inc. 401k Plan to [Rogers] in consideration of the payment as outlined in the written contract.
>
> It is further ORDERED, ADJUDGED, AND DECREED: that the closing agent is hereby directed to disburse to [LBM], through her attorney of record Trust Account, if necessary, her 50% net share of the proceeds at the closing.
>
> It is further ORDERED, ADJUDGED, AND DECREED: that the closing agent is hereby directed to pay [Montgomery's] 50% share of the net proceeds to the Davidson County, Tennessee Circuit Court Clerk's office to be held in an interest-bearing account under docket number 16D-1356.

(*Id.* at PageID# 369.)

Montgomery alleges that "the title companies, after notice and warning letters chose to continue the fraud and conspiracy with LBM, Stover and others toward closure of this sale transaction for self-dealing motives and without investigating." (*Id.* ¶ 86.) Montgomery states that they "violated RESPA laws by not providing all parties in interest notice and disclosure of the transaction details" and "failed to verify the 'seller' was in fact the owner and that the 'owner' was in fact the proper seller in the listing and sales agreements." (*Id.*) Montgomery further alleges that "all of the real estate agents and firms" violated their professional duties "to disclose, act in good faith and choosing instead of self-dealing to get a commission" and that, "despite notice and warning letters[,] they chose to continue their conspiracy with LBM, Stover and others." (*Id.* ¶ 87.)

Smith held a second hearing regarding the sale of the Lakeview Property on February 25, 2022, at which LBM and Montgomery appeared. (Doc. No. 38-3.) In an order entered on April 21, 2022, Smith found that, "to facilitate the sale of the real property, a substitute Plan Administrator and Trustee must be appointed" and appointed LBM as plan administrator and trustee of the 401K Plan "for the purpose of executing the sale, and transfer of the property to the new buyer." (*Id.* at

9

PageID# 371.) Smith ordered LBM "appointed as the Plan Administrator, and Trustee of BZBZBZboy Inc. 401K Plan, thereby replacing all previous Plan Administrator's [sic], and/or TRUSTEES including, but not limited to GARY MONTGOMERY, or any agents appointed by him previously." (*Id.* at PageID# 372.)

The record does not reflect the terms of the Lakeview Property's final sale. On December 29, 2022, Logos Realty Closing Services paid $188,038.92 to the Circuit Court Clerk in compliance with Smith's order reflecting Montgomery's share of the Lakeview Property sale proceeds. (Doc. No. 38-4.)

### B.    Procedural History

Montgomery initiated this action on March 28, 2023, by filing a complaint against Smith's estate, LBM, Rogers, Birthright Title, Property Title, Regal Realty, Hertel, EXIT Real Estate, Schneider, Stover, Taylor, and an Unknown Closing Title Company. (Doc. No. 1.) The complaint asserted claims under 42 U.S.C. § 1983, the Employee Retirement and Income Security Act (ERISA), and Tennessee law, and sought declaratory and injunctive relief, damages, and costs. (*Id.*) Montgomery paid the Court's civil filing fee. (Doc. No. 1-1.)

The Court referred the action to the Magistrate Judge for case management and to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B) and directed the Magistrate Judge to "provide for early, limited discovery to be served by [Montgomery] to ascertain the complete identity of the as-yet fully identified defendant [Unknown Closing Title Company]" and to "set a deadline for [Montgomery] to amend his complaint to identify this individual by name and thereafter to effect service on the defendant." (Doc. No. 4, PageID# 50.) The Magistrate Judge entered an order allowing Montgomery to seek the identity of the Unknown Closing Title Company from the "identified defendants when those defendants have been served and appeared in the action." (Doc. No. 5, PageID# 51.)

Montgomery filed an amended complaint that incorporated additional factual and legal allegations, added Longaberger as a defendant, and removed Unknown Closing Title Company as a defendant. (Doc. No. 11.)

On July 12, 2023, the Clerk of Court issued summonses for each defendant named in the amended complaint and forwarded those summonses to the U.S. Marshals Service to effect service of process. (Doc. No. 12.) Property Title, EXIT Real Estate, Schneider, Rogers, and Birthright Title waived service (Doc. Nos. 23, 24). Hertel, Regal, and Stover were served and entered appearances (Doc. Nos. 30, 32, 33, 48, 49).

Montgomery then moved for entry of default against Longaberger (Doc. No. 59) and LBM (Doc. No. 62), who had not appeared. The Clerk of Court denied Montgomery's motion on May 16, 2024, finding that, "while there is evidence in the record that service of process was achieved as to Longaberger, [Montgomery] cannot verify service of process upon [LBM] because the Process Return filed by the USMS confirms that it was unsuccessful in its attempt to secure service" and that Montgomery's motion was procedurally deficient regarding Longaberger. (Doc. No. 70.)

### C.     The Motions to Dismiss

The defendants assert the following arguments in support of their motions to dismiss.

#### 1.     Defendants Rogers, Birthright Title, Property Title Services, EXIT Real Estate Solutions, and Schneider (Doc. No. 27)

The Real Estate Defendants move to dismiss on grounds that they "withdrew from involvement in the proposed sale, purchase, and closing of the real property in which [Montgomery] alleges he had an ownership interest." (Doc. No. 27.) They state that, "[b]eing in receipt of certain communications from [Montgomery] and, upon becoming aware of [Montgomery's] alleged criminal actions and [Montgomery's] history of *pro se* litigation, the

[Real Estate] Defendants thought it prudent to not proceed in any fashion with consummating any transaction what-so-ever relating to the [Lakeview] Property." (Doc. No. 28.) They argue that, for this reason, they "are not 'parties' to the sale of the [Lakeview] Property, having withdrawn from the proposed transaction in part due to the warnings of 'illegality' sent to them by [Montgomery]." (*Id.*) Accordingly, they argue that "no ***reasonable*** inference that [they] are liable for the misconduct alleged can be drawn" and that the Court should grant their motion to dismiss "as they are not proper parties." (*Id.*) The Real Estate Defendants filed five declarations with their motion to dismiss in which each defendant or its representative states that the defendant withdrew from the Lakeview Property sale and did not conspire with any person against Montgomery.[7] (Doc. Nos. 27-1–27-5.)

Montgomery responds that the Real Estate Defendants' declarations show that they were "involved" in the sale of the Lakeview Property at some point and argues that they were parties to the alleged conspiracy even if they were not parties to the final property sale. (Doc. No. 31.) Montgomery includes a copy of a counteroffer made in the Lakeview Property sale and a copy of the notice of a lien lis pendens action regarding the Lakeview Property that he filed against LBM and Stover with his response. (Doc. No. 31-1.) He states that the "case is ripe for a [Federal Rule of Civil Procedure] 56 judgment" based on the parties' filings. (Doc. No. 31.) Montgomery also

---

[7]    These declarations are "matters outside the pleadings" that, if considered, require the Court to convert the Real Estate Defendants' motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d). Montgomery appears to recognize this by providing supporting documents outside the pleadings with his response and by acknowledging that the motion is "ripe" for judgment under Federal Rule of Civil Procedure 56. (Doc. No. 31.) Because the Court finds that it does not have subject-matter jurisdiction over Montgomery's claims against the Real Estate Defendants, such conversion is not required, and the Court does not consider the Real Estate Defendants' declarations or Montgomery's exhibits in its analysis.

asks the Court to order the Real Estate Defendants to preserve all communications and documents for discovery. (*Id.*)

### 2. Regal Realty Group and Hertel (Doc. No. 35)

Regal and Hertel argue first that Montgomery's claims against them are barred by the *Rooker-Feldman* doctrine because they are an attempt to set aside the divorce decree and related orders entered by Judge Smith. (Doc. No. 38.) Regal and Hertel include copies of the divorce decree and subsequent orders as exhibits to their motion. (Doc. Nos. 38-1–38-4.) They argue that, to the extent Montgomery contends the Lakeview Property should not have been sold, that issue was litigated in the divorce proceedings and collateral estoppel prohibits any further consideration by this Court. (*Id.*) Finally, Regal and Hertel argue that Montgomery has not plausibly alleged any claims against them sufficient to withstand a Rule 12(b)(6) motion to dismiss. (*Id.*)

Montgomery responds that the basis of this action is "violations of ERISA, fraudulent acts, theft, embezzlement and [acting] in concert" and not an attempt to review the state court divorce proceedings to which *Rooker-Feldman* might apply. (Doc. No 46.) He similarly argues that "the precise issues in this ERISA violations based complaint were not actually litigated" in state court and, thus, are not barred by collateral estoppel. (*Id.*) Finally, Montgomery includes new allegations that Hertel engaged in misconduct by failing to provide him with documentation of the Lakeview Property sale and argues that, to the extent his allegations are not sufficiently specific, "[o]nly discovery or admissions will tell" the extent of Regal and Hertel's involvement in the alleged conspiracy. (*Id.*)

Hertel repeats her arguments regarding application of the *Rooker-Feldman* doctrine and collateral estoppel in her reply. (Doc. No. 50.) She also argues that Montgomery may not cure deficiencies in his amended complaint by providing new allegations in responding to the motion to dismiss. (*Id.*) Regal filed a separate reply brief adopting Hertel's arguments. (Doc. No. 51.)

13

### 3. The Estate of Philip E. Smith (Doc. No. 43)

Montgomery sues Smith in his individual and official capacities. (Doc. No. 11.) Smith first argues that Montgomery's claims against him in his official capacity for monetary damages or retroactive injunctive relief are barred by Eleventh Amendment immunity. (Doc. No. 44.) Smith also argues that, in his official capacity, he is not a "person" for purposes of liability under § 1983. (*Id.*) Next, Smith argues that Montgomery's claims against him are barred by the *Rooker-Feldman* doctrine, noting that Montgomery challenged Smith's division of the marital estate and argued that Smith was biased against him in his appeal of the final divorce judgment. (*Id.*) Smith argues that he has absolute judicial immunity from Montgomery's claims against him in his individual capacity because Montgomery challenges judicial acts by Smith acting within his jurisdiction. (*Id.*) Smith also argues that he could not provide the injunctive relief Montgomery requests in his individual capacity and that, even if he could provide the requested legal remedies in his individual capacity, "since [Smith] is now deceased and no longer presides over [Montgomery's] divorce case, he could not provide the injunctive relief requested." (*Id.*) Finally, Smith argues that Montgomery's allegations do not state a colorable claim of a due process violation under § 1983 and are barred by the one-year statute of limitations for such actions. (*Id.*)

Montgomery responds that *Rooker-Feldman* does not apply to his claims in this "ERISA federal statue based" action because his claims address "wrongful acts, misconduct, fraud upon the court, or theft" and not injuries resulting from the state-court judgment. (Doc. No. 56.) Montgomery rejects Smith's claim of judicial immunity and argues that Smith acted without jurisdiction in making decisions that were detrimental to the 401K Plan, not recognizing the 401K Plan as the owner of the Lakeview Property, and denying Montgomery a "full and fair opportunity to litigate" these issues in the divorce proceedings. (*Id.*)

14

### 4. Stover (Doc. No. 47)

Stover argues that Montgomery cannot succeed in a legal malpractice action against him because there was no attorney-client relationship between him and Montgomery in the divorce proceedings and, thus, no duty of care owed by Stover to Montgomery. (Doc. Nos. 47, 47-1.) Stover further argues that "[a]ny allegations against [him] for legal malpractice or 'breach of fiduciary duty' cannot survive since there was no attorney-client relationship." (*Id.*)

Montgomery agrees that he had no attorney-client relationship with Stover in the divorce proceedings. (Doc. No. 58.) He argues, however, that Stover represented him and the 401K Plan "in an eviction action against [Taylor], wherein [Stover] discovered our good financial position and our real property holdings." (*Id.*) Montgomery argues generally that Stover assisted LBM in taking over the 401K Plan through "fraud upon the court and deception." (*Id.*) Montgomery also states that Stover stole and retains possession of Montgomery's corporate records related to the 401K Plan. (*Id.*)

## II. Legal Standards

Federal courts are courts of limited subject-matter jurisdiction and can adjudicate only those claims authorized by the Constitution or an act of Congress. *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 (6th Cir. 2012). Article III of the Constitution extends the federal judicial power "to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States," and several other categories of cases not at issue here.[8] U.S. Const. art. III, § 2, cl. 1; *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Congress has also

---

[8] For example, cases involving ambassadors, public ministers, and consuls and cases between two states or in which the United States is a party. U.S. Const. art. III, § 2, cl. 1.

granted federal courts diversity jurisdiction over civil actions in which the parties are citizens of different states and the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332. Whether the Court has subject-matter jurisdiction is a "threshold" question in any action. *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). This reflects the fundamental principle that "'[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

The party asserting subject-matter jurisdiction bears the burden of establishing that it exists. *Id.* at 104. A motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction "may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005). A facial attack challenges the sufficiency of the pleading and, like a motion under Rule 12(b)(6), requires the Court to take all factual allegations in the pleading as true. *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 861 (6th Cir. 2022). A factual attack "'contests the alleged jurisdictional facts by introducing evidence outside the pleadings.'" *Id.* (quoting *Gaetano v. United States*, 994 F.3d 501, 505 (6th Cir. 2021)). In resolving factual attacks, "'the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts, and the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction.'" *Id.* (quoting *Gaetano*, 994 F.3d at 505).

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the

plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim[.]" Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must plead more than "'labels and conclusions[,]'" "'a formulaic recitation of the elements of a cause of action[,]'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (third alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Montgomery appears pro se, the Court construes his filings "'liberally'" and holds his operative amended complaint "'to less stringent standards than formal pleadings drafted by lawyers[.]'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "However, this lenient treatment has limits." *Frengler v. Gen. Motors*, 482 F. App'x 975, 976 (6th Cir. 2012). "[C]ourts are not required to conjure up unpleaded allegations or guess at the nature of an argument." *Brown v. Cracker Barrel Rest.*, 22 F. App'x 577, 578 (6th Cir. 2001) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

## III.    Analysis

Montgomery does not associate specific causes of action with particular defendants in his amended complaint.[9] (*Id.*) In the section of the amended complaint titled "Claims For Relief," Montgomery alleges that Smith "violated [his] constitutional rights in not providing proper due process, equal protection, and application of the laws" by interfering with Montgomery's pro se advocacy in the divorce proceedings; "denying obvious truth," "intentional[ly] misrepresent[ing]" the law, and "cherry picking" the contents of the record on appeal; violating judicial ethics through biased interactions with Montgomery during the divorce proceedings; "debasing" the 401K Plan by ordering the sale of the Lakeview Property and Montgomery's share of the proceeds to be deposited in a low-interest court account; "negligent[ly] enriching" LBM, Stover, "real estate agents and firms and title companies" by "taking [Montgomery's] ERISA protected funds from

---

[9]    In the introduction to the amended complaint, Montgomery states that he brings this action

> under Title 42 U.S.C. §§ 1983, 1985 and 1986 alleging denial of due process, equal protection and application of law under the Fourteenth Amendment to the United States Constitution, and access to fair judicial process of the courts under the Sixth Amendment to the United States Constitution, and for violations of federal law, namely the Employee Retirement Income Security Act of 1994 ("ERISA") . . . .

(Doc. No. 11.)

Montgomery also cites

> the specific torts of fraud, conspiracy to defraud, theft, attempted theft, forgery, commingling of funds, unjust enrichment, conversion, fiduciary negligence, extortion, misrepresentation, breach of fiduciary duty, legal malpractice, breach of contract, abuse of process, abuse of judicial discretion, debasement of retirement account and its returns, negligent enrichment, intentional infliction of emotional distress, self-dealing and violations of Real Estate Settlements Procedures Act ("RESPA") . . . [and] intentional interference with business relationship.

(*Id.*)

his retirement account"; and causing Montgomery "mental and emotional distress." (Doc. No. 11 ¶¶ 88–90.)

Montgomery alleges that Stover conspired with LBM to "defraud [Montgomery] of retirement and other personal assets" by making misrepresentations to Smith in the divorce proceedings. (*Id.* ¶ 91.) He also alleges that Stover "committed legal malpractice" and "breached his fiduciary duty" by making "misrepresentations to the court and others to further the conspiracy to defraud" and "stealing [Montgomery's] business papers and corporate binders and refusing to return them." (*Id.* ¶ 92.)

Montgomery alleges that Rogers "conspired to close the [Lakeview Property sale] transaction for self-dealing reasons. He knew there was [an] ownership issue." (*Id.* ¶ 95.)

Finally, Montgomery alleges that "all of the real estate professionals, firms and title companies conspired with LBM and Stover to get the sale transaction closed for self-dealing reasons" and, in doing so, "violated [the Real Estate Settlement Procedures Act (RESPA)] laws" by failing to give Montgomery required documentation, intentionally interfered with business relationships, and breached their fiduciary duties under Tennessee law. (*Id.* ¶ 96.)

### A.      Subject-Matter Jurisdiction

Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010); *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009) (noting that "federal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte*"). The Court also must assure itself of jurisdiction before considering the parties' merits-based arguments. *See Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900) (holding that "the first and fundamental question is that of jurisdiction" and that "[t]his question the court is bound to ask and answer for itself, even when

not otherwise suggested, and without respect to the relation of the parties to it"); *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 631 (6th Cir. 2015) ("Courts must resolve questions of subject matter jurisdiction before ruling on the merits of the claim."); *George v. Haslam*, 112 F. Supp. 3d 700, 706 (M.D. Tenn. 2015) ("[A] court must address 'questions pertaining to its jurisdiction before proceeding to the merits[.]'" (quoting *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005))). Accordingly, the Court will begin by evaluating its jurisdiction to hear Montgomery's claims against all defendants.

Regal and Hertel and Smith argue in their motions to dismiss that this Court lacks subject-matter jurisdiction over Montgomery's claims under the *Rooker-Feldman* doctrine. (Doc. Nos. 38, 44.)

The *Rooker-Feldman* doctrine "generally provides that lower federal courts may not engage in appellate review of state-court decisions." *In re Isaacs*, 895 F.3d 904, 912 (6th Cir. 2018). It reflects the fact that the appellate jurisdiction of a federal court "to reverse or modify a state-court judgment is lodged . . . by 28 U.S.C. § 1257, exclusively in" the Supreme Court of the United States. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 283 (2005). *Rooker-Feldman* is a narrow doctrine "confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284. It is "properly applied on a claim-by-claim basis, even though"—or perhaps because—"it is jurisdictional in nature." *In re Isaacs*, 895 F.3d 904, 912 (6th Cir. 2018); *see also Hohenberg v. Shelby Cnty., Tennessee*, 68 F.4th 336, 341 (6th Cir. 2023) ("As the Supreme Court has reminded us nearly once a year for almost two decades, we should not lightly use jurisdictional rules to pinch-hit for non-jurisdictional ones.").

*Rooker-Feldman* is not implicated simply because a claim brought in federal court would "call [an earlier state-court judgment] into question" or "undermine a judgment's legal underpinnings." *Hohenberg*, 68 F.4th at 341; *see also McCormick v. Braverman*, 451 F.3d 382, 392 (6th Cir. 2006) (holding that "independent claims may deny a legal conclusion of the state court" but "this fact does not lead to a divestment of subject matter jurisdiction in the federal courts"; instead, "preclusion law is the appropriate solution for these independent claims"). Nor does *Rooker-Feldman* "bar a federal-court challenge to an individual's improper conduct during a prior state court proceeding." *Pittman v. Cuyahoga Cnty Dep't of Children and Family Servs.*, 241 F. App'x 285, 288 (6th Cir. 2007). "And it is not an all-purpose abstention doctrine, lying in wait to untangle snarls when state and federal litigation mix." *Hohenberg*, 68 F.4th at 339. Rather, the doctrine "requires a challenged 'judgment' in the new action" and "an effort to 'review' that judgment, namely to 'undo' or 'overturn' it in the new action." *Hohenberg*, 68 F.4th at 340 (quoting *Exxon*, 544 U.S. at 284, 287 & n.2, 293).

To determine if *Rooker-Feldman* applies to a particular claim, "[t]he inquiry then is the source of the injury the plaintiff alleges in the federal complaint." *McCormick*, 451 F.3d at 393. "The key point is that the source of the injury must be from the state court judgment itself; a claim alleging another source of injury is an independent claim." *Id.* at 394. "The source of the plaintiff's injury may in turn be determined by examining the request for relief." *In re Isaacs*, 895 F.3d at 912. A request for relief that "effectively asks the [federal court] to vacate the state-court judgment" or "declare the state court's . . . judgment invalid" "falls within *Rooker-Feldman*'s bar." *Id.* at 913. *Rooker-Feldman* also bars, "in some circumstances, federal suits that purport to complain of injury by individuals [but] in reality complaint of injury by state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 89 (2d Cir. 2005). "For example, if a third

party's actions are the product of a state court judgment, then a plaintiff's challenge to those actions [is] in fact a challenge to the judgment itself." *McCormick*, 451 F.3d at 394 (citing *Hoblock*, 422 F.3d at 87–88).

Comparison of Montgomery's amended complaint with the state court divorce proceeding orders readily shows that most of what Montgomery seeks in this Court is to undo what Smith ordered in the divorce. *See Hoblock*, 422 F.3d at 88 (finding that, to determine whether a plaintiff's "injury was produced by the state-court judgment" a court "look[s] both at the allegations in the [plaintiff's] federal complaint and the records of the state-court proceedings"). Even though Montgomery has couched his claims in terms of ERISA violations and wrongdoing by LBM, Stover, Smith, and the other defendants—and even though Montgomery states that "[t]his matter is <u>not</u> an attempt to re-litigate any case" (Doc. No. 11, PageID# 65)—the amended complaint is, at heart, a second appeal of the Montgomerys' divorce decree.

For example:

- Montgomery asks this Court to issue an "injunction to prevent closing of the sale of the 401K Plan owned property," for the "return of the real property to the proper owner 'Bzbzbzboy Inc. 401K Plan,'" and for himself to be "reinstate[d] . . . as the proper trustee and plan administrator." (Doc. No. 11 ¶¶ 99, 100.) Such an injunction would undo Smith's orders requiring that LBM "sell the [Lakeview Property]" (Doc. No. 38-1); appointing LBM "as the plan administrator, and trustee of BZBZBZboy Inc. 401k Plan, thereby replacing all previous Plan Administrator[]s, and/or TRUSTEES including, but not limited to [Montgomery]" (Doc. No. 38-3); and "reliev[ing Montgomery] of any further responsibility, authority, or right to interfere with [LBM's] Appointment as Substitute Plan Administrator/Trustee as she consummates the sale of the real property at issue in this case" (Doc. No. 38-3).

- Montgomery's request that the Court order LBM to "return monies diverted to pay loans and specifically monies to pay her personal tax debt of $40,000+, and [Montgomery's] stolen and thrown away items" (Doc. No. 11) would undo the divorce decree's order that LBM "pay directly . . . the IRS debt of approximately $40,000" and "the balance of the HVAC loan from the proceeds of the [Lakeview Property] sale." (Doc. No. 38-1).

- Montgomery asks the Court order LBM to "pay [him] all of the 401K Plan income collected from June 2016 to present . . . and to pay any uncollected rents representing los[s]es to the Plan" (Doc. No. 11). That order would undo the divorce decree's division of the marital estate (Doc. No. 38-1).

- Montgomery's request that the Court order Smith to "compensate the 401K Plan for loss of interest/earning power" from depositing the sale proceeds into a court account "earning measly 0.25% interest per year" (Doc. No. 11) would undo the divorce decree's order that Montgomery's "proceeds from the sale . . . be held and deposited into an interest-bearing escrow account with the clerk at the circuit court . . ." (Doc. No. 38-1).

- Montgomery's request that this Court require "[a]ll other defendants . . . [to] return fees and commissions received from the Plan" because "[t]hey should not be allowed unjust enrichment" (Doc. No. 11) would undo the divorce decree's order vesting in LBM "the sole authority to select the real estate listing agent" (Doc. No. 38-1) and the subsequent orders approving the sale of the Lakeview Property to Rogers (Doc. No. 38-2) and "grant[ing] LBM the authority to sign all closing documents necessary to transfer title of said property from BZBZBZboy Inc. 401K Plan to [Rogers] in consideration of the payment as outlined in the written contract" (*Id.*).

Montgomery cannot "avoid *Rooker-Feldman* simply by clever pleading—by alleging that actions taken pursuant to a court order violate his rights without ever challenging the court order itself[.]" *Hoblock*, 422 F.3d at 88. Every alleged wrongful act associated with these claims for relief was ordered by the divorce decree or the subsequent related orders. All of those claims fall within *Rooker-Feldman*'s bar.

Having conducted this analysis of Montgomery's claims and claimed damages, the Court finds it readily apparent that the source of Montgomery's injuries is the state court divorce decree and Smith's following orders and not any defendant's independent conduct. Montgomery's pleading shows him to be the quintessential "state-court loser[] complaining of injuries caused by state-court judgments . . . and inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 283. However, the Court is mindful of recent opinions calling out "the lower courts' extravagant use of *Rooker* and *Feldman* as a 'quasi-magical means of docket clearing.'" *Hohenberg*, 68 F.4th at 340. Because Montgomery has included allegations in the amended complaint that certain defendants engaged in wrongful actions independent of the divorce decree and following orders, the Court must assure itself that Montgomery has not adequately pleaded any claims against these defendants that are not subject to *Rooker-Feldman*'s bar.

## B. Additional Allegations Against Regal, Hertel, and the Real Estate Defendants

Montgomery argues throughout his responses to the defendants' motions to dismiss that he brings this action to address ERISA violations and fraud and misrepresentations made during the divorce proceedings—"improper conduct" that he argues is independent of the state-court judgment—and not to challenge the divorce decree. *Pittman*, 241 F. App'x at 288. And Montgomery is right that claims to address "fraud and misrepresentation" made during state-court proceedings are not subject to *Rooker-Feldman*'s bar. *See McCormick*, 451 F.3d at 393. But, as the party invoking federal jurisdiction, Montgomery bears the burden of showing that it exists. *See*

24

*Lewis v. Whirlpool Corp.*, 630 F.3d 484, 487 (6th Cir. 2011); *N.A.A.C.P.-Special Contribution Fund v. Jones*, 732 F. Supp. 791, 794 (N.D. Ohio 1990). Montgomery's allegations of independent improper conduct during the state court proceedings do not state plausible claims for relief and, thus, "are insufficient to defeat application of *Rooker-Feldman*." *Thompson v. Gorcyca*, No. 20-CV-10727, 2021 WL 4220753, at *5 (E.D. Mich. Sept. 16, 2021) (citing *Sparks v. NBC E-Online*, No. 220CV05549ODWSPX, 2021 WL 860001, at *3 (C.D. Cal. Mar. 8, 2021) ("Here, based on the allegations in [plaintiff's] Complaint ... [plaintiff] did not plausibly allege facts showing that an adverse party committed an extrinsic fraud on the state court. Accordingly, the [c]ourt dismissed his Complaint because it merely sought to set aside a state-court judgment based on a purported legal error—a textbook example of a case barred by *Rooker-Feldman*"); *Andrews v. California Dep't of Consumer Affairs*, 2018 WL 1471877, at ** 3-4 (N.D. Cal. Mar. 26, 2018) (explaining that, while *Rooker-Feldman* "does not bar federal jurisdiction over claims asserting that state-court judgments have been obtained by extrinsic fraud upon the court," *Rooker-Feldman* nonetheless barred the plaintiff's claims because "[t]he facts on which [plaintiff] relie[d]" did not "add up to a plausible claim of extrinsic fraud"); *Collins v. Wells Fargo Bank*, No. CV-12-2284-PHX-LOA, 2013 WL 1092894, at *10 (D. Ariz. Mar. 15, 2013) (finding that the "Amended Complaint fail[ed] to allege sufficient facts upon which to base a plausible claim for extrinsic fraud to preclude the application of the *Rooker–Feldman* doctrine")).

First and foremost, the conspiracy of fraud and misrepresentations among the defendants as Montgomery describes it had one objective: to reap the profits of the Lakeview Property's sale and plunder Montgomery's retirement funds by falsely representing to the state court that LBM owned the Lakeview Property when the 401K Plan was its true owner. (*See* Doc. No. 11 ¶ 34 {"[T]he real owner of the [Lakeview Property] was the solo 401K 'BZBZBZboy Inc. 401k Plan'

. . . It was not owned by LBM or [Montgomery] and both LBM and Stover knew that when they made false representations to the court."); *id.* at ¶ 38 ("LBM and Stover conspired to trick the court with misrepresentations to cover up the true owner . . . who should have been noticed and involved . . . ."); *id.* at ¶ 64 ("As evidenced by Wilson County Records Office, the owner of the real property was 'BZBZBZboy Inc. 401k Plan' and not 'Lesley Montgomery.' The property was not legally listed or sold by the 401K Plan. It was manipulated into sale by LBM and Stover's tricker/slight [sic] of hand.").) But the divorce decree and following orders are based on an understanding that the 401 K Plan owned the Lakeview Property. (*See* Doc. No. 38-1, PageID# 353 (the Lakeview Property "was conveyed back to Bzbzbzboy by Larry Hartman with the execution of the Quit Claim deed"); *id.* at PageID# 357 ("The real property is owned by Bzbzbzboy, which was originally set up as a 401k."); Doc. No. 38-2, PageID# 368 (reflecting that "the Court found that the [Lakeview Property] titled in the name of BZBZBZboy Inc. 401k Plan is marital property . . . ."); *id.* at PageID# 369 (granting LBM "the authority to sign all closing documents necessary to transfer title of said property from BZBZBZboy Inc. 401k Plan to DOUG ROGERS in consideration of the payment as outlined in the written contract").) Montgomery's allegations that LBM and Stover committed fraud by misrepresenting to the state court and the Real Estate Defendants that LBM owned the Lakeview Property are not plausible when considered with the public records of the divorce proceedings.

Second, Montgomery alleges that "'all of the real estate agents and firms' failed to disclose information to [him], failed to act in good faith, and chose to engage in 'self-dealing' and 'conspiracy'" and that "'all of the real estate professionals, firms, and title companies conspired . . . to get the sale transaction closed," violated RESPA, and breached their statutory professional duties to the public in misrepresenting that LBM was the owner of the Lakeview Property. (Doc.

No. 11.) But Montgomery does not identify what role any real estate agent or firm—including Regal or Hertel—played in any relevant event or allege a specific act taken by any of these defendants. Montgomery alleges that Rogers "failed to heed [his] notices and warning letters there was a lis pendens on the [Lakeview Property]" and that the 401K Plan, not LBM, owned the property. (*Id.* ¶ 85.) He also alleges that Rogers "intentionally chose to continue to conspire with LBM, Stover, title companies and the real estate professionals for self-dealing motives." (*Id.*) But he does not allege how Rogers conspired with any other defendant or what harm resulted from Rogers's "fail[ure] to heed" Montgomery's "warning letters." (*Id.*) "'"[N]aked assertions devoid of further factual enhancement"' contribute nothing to the sufficiency of the complaint.'" *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 355 (6th Cir. 2014) (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (internal quotations omitted)). Montgomery does not plausibly allege any conduct by Regal, Hertel, Rogers or the other Real Estate Defendants to support claims against them that fall outside *Rooker-Feldman*'s bar.

Accordingly, Montgomery's allegations of conspiracy, fraud, misrepresentations, and RESPA violations by Regal, Hertel, and the Real Estate Defendants are insufficient to defeat application of *Rooker-Feldman* to bar his claims against those defendants.

### C. Additional Allegations Against Stover

Montgomery generally alleges that Stover "committed legal malpractice in his misrepresentations to the court and others to further the conspiracy to defraud" (*id.* ¶ 92) and that Stover and LBM stole Montgomery's "business papers and corporate binders and refus[ed] to return them" (*id.*).

Stover only addresses Montgomery's legal malpractice claim in his motion to dismiss. To plead a claim of legal malpractice under Tennessee law, Montgomery must allege "(1) that the

accused attorney owed a duty to the plaintiff, (2) that the attorney breached that duty, (3) that the plaintiff suffered damages, (4) that the breach was the cause in fact of the plaintiff's damages, and (5) that the attorney's negligence was the proximate, or legal, cause of the plaintiff's damages." *Gibson v. Trant*, 58 S.W.3d 103, 108 (Tenn. 2001). Stover argues that Montgomery's legal malpractice claim must fail under Tennessee law because there was no attorney-client relationship between Stover and Montgomery in the divorce proceedings and, thus, Stover owed no duty to Montgomery that could be breached. Montgomery responds that, although Stover did not represent him in the divorce, Stover represented Montgomery and the 401K Plan "in an eviction action against [Taylor], wherein he discovered our good financial position and our real property holdings." Stover does not address any effect of this prior representation in his motion.

"In Tennessee . . . actions brought by third parties against attorneys for professional negligence/negligent misrepresentation . . . are to be considered 'malpractice' actions." *Hanson v. Rudnick & Wolfe*, No. 92-5480, 1993 WL 100084, *4–5 (6th Cir., Apr. 5, 1993) (rejecting "proposition that only *clients* can bring 'malpractice' actions" and citing *Security Bank & Trust Co. v. Fabricating, Inc.*, 673 S.W.2d 860 (Tenn. 1983), "which specifically denominates a third-party suit against attorneys a 'malpractice' cause of action"). Thus, the lack of an attorney-client relationship between Montgomery and Stover in the divorce proceedings does not necessarily defeat Montgomery's claim. But Montgomery does not allege that Stover's breach of any duty he owed Montgomery resulted in damages or that Stover's negligence was the proximate cause of any harm to him. Montgomery alleges only that "Stove[r] committed legal malpractice in his misrepresentations to the court and others to further the conspiracy to defraud, failing to disclose all to [Montgomery] and for stealing [Montgomery's] business papers and corporate binders and

refusing to return them. Stover breached his fiduciary duty."[10] (Doc. No. 11, ¶ 92.) Montgomery has not alleged a plausible legal malpractice claim against Stover that would fall outside *Rooker-Feldman*'s bar.

Finally, Montgomery alleges that Stover stole his business records regarding the 401K Plan and has not returned them. Although Montgomery does not identify it as such, it appears he intends to plead a conversion claim under Tennessee law. "Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012). To state a claim for conversion, a plaintiff must allege "with particularity" "(1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." *Id.*

Montgomery alleges that LBM and Stover "stole [his] corporate binder for his business 'BZBZBZboy Inc.' . . . It contained incorporating documents, minutes, financial transfer documents[,] etc. They also stole binders for two . . . other corporations and for the 401K Plan. These binders were kept in [Montgomery's] secure home and in a safe. The safe combo was never shared with LBM." (Doc. No. 11 ¶ 39.) Montgomery alleges that, "at the very first divorce hearing in front of Smith," he advised Smith that the documents demonstrating that the Lakeview Property "was purchased by [him] with sole and separate money from a retirement account and thereafter sold to the plan" were in Montgomery's "binder, which was on LBM and Stover's plaintiff table." (*Id.* ¶ 40.) Montgomery alleges that Smith ignored this.

---

[10]     Montgomery does not allege that Stover obtained his "business papers and corporate binders" in the course of any prior representation. Rather, he alleges that LBM and Stover stole the binders and documents from Montgomery's private safe. (Doc. No. 11 ¶ 39.)

Stover has not addressed whether these allegations state a plausible conversion claim under Tennessee law. Liberally construed in recognition of Montgomery's pro se status, these allegations may state a conversion claim based on independent conduct that would fall outside the *Rooker-Feldman* bar. However, the fact that this tort claim is the only cause of action against Stover that remains, the likelihood that no federal causes of action will survive the defendants' motions, and the state law underpinnings of all Montgomery's claims in this action constitute "exceptional circumstances" that counsel against this Court retaining jurisdiction over this remaining claim. The Court should, in its discretion, decline to exercise supplemental jurisdiction over Montgomery's conversion claim against Stover. 28 U.S.C. § 1367(c)(3)–(4); *see Veneklase v. Bridgewater Condos*, L.C., 670 F.3d 705, 716 (6th Cir. 2012) (recognizing "default assumption" that a court will exercise supplemental jurisdiction over related claims when there is a basis for the court's original jurisdiction and the statutory basis for declining to do so when the court "has dismissed all claims over which it has original jurisdiction" or "in exceptional circumstances" where there "are compelling reasons for declining jurisdiction" (quoting *Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 892 (6th Cir. 1998), and then quoting 28 U.S.C. § 1367(c)(3)–(4)).

## D. Additional Allegations Against Smith

Montgomery's allegations against Smith are framed as a claim under § 1983 that Smith violated his constitutional rights to due process, equal protection, and access to the courts. To support this claim, Montgomery alleges acts including that Smith ignored Montgomery's motions and arguments, did not allow him the same level of advocacy that he allowed Stover, spoke to Montgomery condescendingly, prevented Montgomery from having a full record of the proceedings to pursue an appeal, and "conspired" with LBM and Stover to Montgomery's detriment in the divorce proceedings. (Doc. No. 11.) These acts could be considered "improper conduct" that is independent of the state-court judgment. *Pittman*, 241 F. App'x at 288. To the

extent they are independent conduct, Smith argues other jurisdictional bars: that he is entitled to absolute judicial immunity from suit in his individual capacity and to Eleventh Amendment sovereign immunity from suit in his official capacity (Doc. No. 44). *See Does v. Whitmer*, 69 F.4th 300, 305 (6th Cir. 2023) (noting that the Sixth Circuit "treat[s] sovereign immunity as a 'jurisdictional bar' that, 'once raised as a jurisdictional defect, must be decided before the merits'") (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015)).

### 1. Judicial Immunity

"It is well[ ]established that judges enjoy judicial immunity from suits arising out of the performance of their judicial functions." *Leech v. DeWeese*, 689 F.3d 538, 542 (6th Cir. 2012) (quoting *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2004)). "[T]he paradigmatic judicial act is the resolution of a dispute between parties who have invoked the jurisdiction of the court." *Morrison v. Lipscomb*, 877 F.2d 463, 465 (6th Cir. 1989) (citing *Forrester v. White*, 484 U.S. 219, 226 (1988)). The immunity that shields a judge from liability while performing those paradigmatic duties can be pierced in only two circumstances: when a judge's "actions [are] not taken in the judge's judicial capacity" or when a judge's "actions, though judicial in nature, [are] taken in complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991).

Montgomery argues that Smith "acted without all authority (jurisdiction) and thereby without the shield of immunity" when Smith "completely ignored [Montgomery's] pleadings" regarding the proper owner of the 401k Plan. (Doc. No. 56, PageID# 460.) Montgomery also argues that Smith made rulings based on misapplication of the law and against the evidence and that Smith's bias against Montgomery contributed to those erroneous rulings. (Doc. No. 56.)

"A judicial officer acts in the clear absence of jurisdiction only if he knows that he lacks jurisdiction, or acts despite a clearly valid statute or case law expressly depriving him of jurisdiction." *Mills v. Killebrew*, 765 F.2d 69, 71 (6th Cir. 1985). Montgomery does not allege that

Smith's actions were extrajudicial in this way or that Smith did not have jurisdiction over the divorce proceedings under Tennessee law; he simply alleges that Smith's rulings were wrong and were made in bad faith and with malice against him. Even taken as true, those allegations do not overcome the judicial immunity afforded Smith in his individual capacity. *See Leech v. DeWeese*, 689 F.3d 538, 543 (6th Cir. 2012); *Stern v. Mascio*, 262 F.3d 600, 607, 608 (6th Cir. 2001) (finding that "[e]ven grave procedural errors or acts taken when no statute purports to confer on the court the authority purportedly exercised will not deprive a judge of judicial immunity"). That immunity applies even "to acts performed maliciously and corruptly as well as acts performed in bad faith or with malice . . . ." *Brookings*, 389 F.3d at 617.

### 2. Sovereign Immunity

Smith also argues that, as a state actor, he is entitled to sovereign immunity from Montgomery's claims against him for money damages or retroactive injunctive relief in his official capacity. (Doc. No. 44.) Montgomery has not responded to this argument.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State, [the Supreme Court's] cases have extended the Amendment's applicability to suits by citizens against their own States." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). "The immunity also applies to actions against state officials sued in their official capacity for money damages." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (quoting *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005)). However, Eleventh Amendment "immunity applies only to lawsuits against the State or 'an arm of the State,' not to those against political subdivisions like counties." *Laborers'*

*International Union, Local 860 v. Neff*, 29 F.4th 325, 330 (6th Cir. 2022) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)); *see also Ernst*, 427 F.3d at 358.

"[F]or the purpose of sovereign immunity[,] 'individuals sued in their official capacities stand in the shoes of the entity they represent.'" *S.J. v. Hamilton Cnty.*, 374 F.3d 416, 420 (6th Cir. 2004) (quoting *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003)). The Court must therefore determine whether the Davidson County Circuit Court is considered an arm of the State of Tennessee for purposes of the Eleventh Amendment. The Sixth Circuit directs courts to apply four factors in making that determination:

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Ernst*, 427 F.3d at 359 (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44–45 (1994)).

This Court has found that Tennessee county criminal courts, chancery courts, and general sessions courts are considered arms of the state under the *Ernst* analysis. *See Valentine v. Gay*, No. 3:23-CV-00204, 2023 WL 6690934, at *5 (M.D. Tenn. Oct. 12, 2023) (finding Sumner County Criminal Court to be an arm of the state for Eleventh Amendment purposes); *Doe v. State of Tennessee*, No. 3:18-CV-00471, 2022 WL 3365062, at *7 (M.D. Tenn. Aug. 15, 2022) (finding Dickson County Chancery Court and Dickson County General Sessions Court to be arms of the state for Eleventh Amendment Purposes). The *Ernst* test directs the same result for the Davidson County Circuit Court, which is created, funded, and maintained by the same state statutory and constitutional authority. Thus, the Eleventh Amendment bars claims against Smith in his official capacity unless an exception applies.

"There are three exceptions to a state's sovereign immunity: (1) when the state has consented to suit; (2) when the exception set forth in *Ex parte Young*, 209 U.S. 123 (1908)[,]

applies; and (3) when Congress has clearly and expressly abrogated the state's immunity." *Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 598 (6th Cir. 2016). None of these exceptions applies to Montgomery's official-capacity claims against Smith.

First, the Tennessee Constitution provides that Tennessee has sovereign immunity from claims brought against it unless the State Legislature expressly waives that immunity. Tenn. Const. art. 1, § 17. The State Legislature codified this provision in Tenn. Code Ann. § 20-13-102, which bars suits against the State of Tennessee in state and federal courts unless the State Legislature has expressly waived that immunity. *See Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986) (citing Tenn. Code Ann. § 20-13-102(a)); *Woolsey v. Hunt*, 932 F.2d 555, 565 (6th Cir. 1991) (quoting Tenn. Code Ann. § 20-13-102(a)). Tennessee has not waived its immunity to claims brought under § 1983. *See Berndt*, 796 F.2d at 881. The first exception therefore does not apply.

Second, the *Ex parte Young* exception allows suits for prospective injunctive relief against state officials acting in violation of federal law. *See Boler v. Earley*, 865 F.3d, 391,412 (6th Cir. 2017) (quoting *S & M Brands, Inc.*, 527 F.3d at 507). Smith asserts sovereign immunity only as a bar to any claims for retroactive injunctive relief Montgomery brings against him.

Third, "[s]ection 5 of the Fourteenth Amendment . . . grant[s] Congress the authority to abrogate the States' sovereign immunity." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000). A federal statute may abrogate the states' sovereign immunity if "Congress unequivocally expressed its intent to abrogate that immunity" while "act[ing] pursuant to a valid grant of constitutional authority." *Id.* at 73. The Supreme Court has held that Congress did not abrogate states' immunity to suits brought under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65–67 (1989); *see also Boler*, 865 F.3d at 410. The third exception does not apply to Montgomery's claims against Smith.

To the extent Montgomery's claims against Smith are not subject to *Rooker-Feldman*, they are barred by judicial immunity and sovereign immunity and are properly dismissed on those grounds.

* * *

Because all Montgomery's claims against these defendants are subject to dismissal for a lack of subject-matter jurisdiction under *Rooker-Feldman* or are barred by judicial or sovereign immunity, the Court need not—and should not—address the additional arguments made in the defendants' motions to dismiss. *Steel Co.*, 523 U.S. at 94.

## IV.    Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that the Court GRANT the motion to dismiss filed by Defendants Rogers, Birthright Title, Property Title, EXIT Real Estate, and Schneider (Doc. No. 27) and Regal Realty and Hertel (Doc. No. 35) for a lack of subject-matter jurisdiction under *Rooker-Feldman*; GRANT the motion to dismiss filed by Smith for lack of subject-matter jurisdiction under *Rooker-Feldman* and because any independent claims are barred by judicial immunity or sovereign immunity (Doc. No. 43); and GRANT Stover's motion to dismiss as to Montgomery's legal malpractice claim, DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION over Montgomery's conversion claim, and DISMISS the conversion claim WITHOUT PREJUDICE to refiling in state court (Doc. No. 47).

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 19th day of August, 2024.

ALISTAIR E. NEWBERN
United States Magistrate Judge